USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ______
DATE FILED: 12/7/2023

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

UNITED STATES OF AMERICA,

-against-

S1 23 Cr. 65 (CM)

MOSHE ROSENFELD,

Defendant.

---------------------------------------------------------------x

DECISION AND ORDER ON DEFENDANT'S MOTION TO SUPPRESS

McMahon, J.:

Moshe Rosenfeld is charged with conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344, and 1349, and conspiracy to make false statements to banks and the Small Business Authority ("SBA") , in violation of 18 U.S.C. §§ 371, 1014, and 15 U.S.C. § 645(a). (Dkt. 31). Rosenfeld and his codefendant, Zvi Zigelman, are alleged to have submitted fraudulent application to various banks and the SBA, through two loans programs that the Federal Government created to help small business owners weather the economic fallout from the COVID-19 pandemic—the Paycheck Protection Program ("PPP") and the Economic Injury Disaster Loan Program ("EIDL"). As a result of the scheme, Rosenfeld and Zigelman illegally obtained approximately $1,353,000 in loans funds—approximately $942,000 from the SBA's EIDL Program and approximately $411,000 from U.S. banks in PPP loan funds.

Before the Court is defendant Rosenfeld's motion to suppress statements he made to law enforcement after his arrest, and evidence from his cellphone that was obtained pursuant to a search warrant. (Dkt. 54).

The Government opposes suppression. It argues that Rosenfeld's statements to law enforcement were freely made after he knowingly and voluntarily waived his *Miranda* rights, and that the cellphone evidence was seized pursuant to a judicially authorized search warrant.

Rosenfeld does not ask for a hearing, and I agree with the Government that there is no dispute of material fact that would require one. The video recording of the interview and the accompanying transcript speaks for themselves.

The motion to suppress statements is granted in part; the motion to suppress cell phone data is denied.

Rosenfeld's Motion to Suppress His Statements to Agents

*Legal Standard*

To prove a valid waiver of *Miranda* rights, the Government must show, by a preponderance of the evidence, that the defendant had a full awareness of the rights being waived and the consequences of waiving those rights, and that the defendant relinquished those rights voluntarily. *See Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986); *United States v. Jaswal*, 47 F.3d 539, 542 (2d Cir. 1995) (per curia). In other words, the defendant's waiver must be knowing and voluntary. If the Government "establishes that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver." *Berghuis*, 130 S.Ct. at 2253. Similarly, "[i]n general, a suspect who reads, acknowledges, and signs an 'advice of rights' form before making a statement has knowingly and voluntarily waived *Miranda* rights." *United States v. Taylor*, 745 F.3d 15, 23 (2d Cir. 2014); *see also Plugh*, 648 F.3d at 127-28; *Spencer*, 995 F.2d at 11-12.

A defendant's waiver of his *Miranda* rights is *not* voluntary within the meaning of the Fifth Amendment only if it is obtained by "'techniques and methods offensive to due process' or other circumstances in which the suspect clearly had no opportunity to exercise 'a free and unconstrained will.'" *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (quoting *Haynes v. Washington*, 373 U.S. 503, 514-15 (1963)). Accordingly, a confession is involuntary only when it results from police misconduct. *Colorado v. Connelly*, 479 U.S. 157, 167-69 (1986) (holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary'"). In conducting this voluntariness inquiry, courts look to whether the defendant's will was "overborne" by the coercive conduct of law enforcement officers such that his statements cannot be deemed to be the "product of a rational intellect and a free will." *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963) (internal quotation marks omitted). This assessment requires "a careful evaluation of the totality of all the surrounding circumstances," including (1) "the accused's characteristics," (2) "the conditions of interrogation," and (3) "the conduct of law enforcement officials." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991).

Pursuant to *Miranda* and its progeny, a defendant has a right to counsel when he is subject to custodial interrogation. *See Miranda*, 384 U.S. 436, 470-71 (1966); *Edwards v. Arizona*, 451 U.S. 477, 481 (1981). In order to invoke the right to counsel a suspect must "unambiguously request counsel." *Davis v. United States*, 512 U.S. 452, 459 (1994). The purpose of *Miranda* was to create "clear-cut" rules that "could be readily understood and administered by officers," and the case law requiring an unambiguous invocation of counsel furthers that goal. *United States v. Plugh*, 648 F.3d 118, 126 (2d Cir. 2011). This "clear statement" rule exists because "it is police officers who must actually decide whether or not

they can question a suspect.....when the officers conducting the questioning reasonably do not know whether or not the suspect wants a lawyer, a rule requiring the immediate cessation of questioning would transform the *Miranda* safeguards into wholly irrational obstacles to legitimate police investigative activity." *Davis*, 512 U.S. at 460- 61 (internal quotation marks omitted).

A determination of whether a suspect has invoked his right to counsel is an objective inquiry; a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Davis*, 512 U.S. at 459. Absent that "level of clarity," the officers need not stop questioning the suspect. *Id.* Therefore, "[i]If an accused makes a statement concerning the right to counsel 'that is ambiguous or equivocal' . . . the police are not required to end the interrogation, .. . or ask questions to clarify whether the accused wants to invoke his or her *Miranda* rights." *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010) (*quoting Davis*, 512 U.S. at 459, 461-62); *see also Davis*, 512 U.S. at 462 ("Maybe I should talk to a lawyer" was not an invocation of the right to counsel).

Once a defendant has unequivocally invoked his right to counsel, interrogation is to cease. However, "[i]f, after receiving *Miranda* warnings and invoking the right to counsel, the accused himself initiates further communication, exchanges, or conversations with the police, those unsolicited statements are admissible." *United States v. Miller*, 116 F.3d 641, 680 (2d Cir. 1997). Statements in response to questioning after a defendant invokes his right to counsel may be admitted "only on finding that [the defendant] (a) initiated further discussions with the police, and (b) knowingly and intelligently waived the right he had invoked." *Id.*

That waiver must be assessed under "the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue." *Edwards*, 451 U.S. at 486 n.9. Reinitiation of dialogue by the defendant can be found where a defendant has "evinced a willingness and a desire for a generalized discussion about the investigation," as opposed to more discrete or "routine" inquires "such as a request for a drink of water or a request to use a telephone." *Oregon v. Bradshaw*, 462 U.S. 1039 (1983).

*Rosenfeld's Waiver was Knowing, Intelligent, and Voluntary*

Rosenfeld's native tongue is Hebrew, but he speaks English. He nonetheless argues that "it was impossible for [him] to waive his *Miranda* rights in a knowing, intelligent, and voluntary manner because he did not have a solid understanding of the agents' own words." Def. Reply at 2. I reject this proposition.

Rosenfeld was arrested by the FBI at John F. Kennedy Airport on October 22, 2022, after deplaning a flight from Hungary. He was immediately taken to the FBI Resident Agency Office, located within the airport complex. Rosenfeld was placed in an interview room and handcuffed by one wrist to a wall rail.[1] Present in the room were FBI Special Agents Jennifer Lewis and Joanna Maroudas. Before any substantive questioning began, Rosenfeld was given a sandwich and a bottle of water. (*See* Govt. Ex. A at 1 (Transcript); Govt. Ex. B at 00:20-00:55 (Interview Video Part 1)). The agents provided Rosenfeld with a copy of the arrest warrant and asked him whether he could read English. Rosenfeld answered (in English), "If I don't understand I will ask you." (Ex. A at 1; Ex. B at 1:00). (*See* Ex. A at 21-22).

[1] The Government represents that Special Agent Lewis would testify that, it was standard protocol to have an arrested defendant secured using handcuffs at all times, to the extent possible.

After Rosenfeld finished reviewing the arrest warrant, the agents read him his *Miranda* rights in English. Before starting, they offered to provide him a Hebrew-language version of the *Miranda* rights form; Rosenfeld indicated that he would prefer to see the document in Hebrew. (Ex. A at 1-2; Ex. B at 1:00-1:30). It was provided to him, although not until after his rights were read in English. (*See* Ex. A at 2; Ex. B at 2:35-3:00; Decl. of Special Agent Jennifer Lewis ("Lewis Decl.") ¶ 4 and Ex. 1).

As Special Agent Lewis read Rosenfeld his rights, defendant indicated that he understood each one; he specifically engaged in colloquy with the Agent about his right to counsel:

> JL: So before we ask you any questions, you must understand your rights, okay? You have the right to remain silent.
>
> R: Okay. To be quiet.
>
> JL: Okay? Anything you say can be used against you in court, okay?
>
> R: Okay.
>
> *JL: You have the right to talk to a lawyer for advice before we ask you any questions.*
>
> *R: Before or the middle?*
>
> *JL: Before or...*
>
> *R: When you ask me question about [UI]?*
>
> *JL: You can ask for a lawyer at any point.*
>
> *R: Any point, okay.*
>
> *JL: That's your right. Any time, okay? Um, you have the right to have a lawyer with you during questioning.*
>
> *R: Okay.*
>
> JL: If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

R: Okay.

(Ex. A at 2; Ex. B at 1:50-2:40 (Emphasis added)).

After giving him the rights form in Hebrew and giving him an opportunity to read it, the agents again asked Rosenfeld if he understood his right. He answered, "Yes." (Ex. A at 2; Ex. B at 3:00). They then instructed Rosenfeld that "if you agree to talk to us, you sign [the English-language version of the *Miranda* rights form]." (Ex. A at 2, Ex. B at 3:05). Rosenfeld signed the English-language form and orally confirmed his understanding that he "got my rights." Specifically confirming his understanding of his right to counsel, Rosenfeld said, "If I want a lawyer, I will tell you." (Ex. A at 3; Ex. B at 3:05-3:25; Lewis Decl. ¶¶ 4-5 and Ex. 2).

The Court finds that Rosenfeld fully understood his *Miranda* rights, including specifically his right to have counsel present and to ask for a lawyer at any point. I reject the argument that he did not understand his rights because they were not read to him in Hebrew. Having watched the videotape of the interrogation, I find that Rosenfeld speaks excellent English and does not suffer from deficiencies that prevented him from understanding what the agents were saying to him. Moreover, Rosenfeld was given a copy of the *Miranda* warnings in Hebrew and had an opportunity to read them in his native language. He indicated that he understood them after reading them in Hebrew, and did so before finally signing the form to indicate that he "got my rights." Significantly, he ended the pre-interrogation colloquy by saying that he would tell the agents if he wanted a lawyer.

In a declaration filed in support of his motion, Rosenfeld stated that he told the Agents that he was diabetic and that he did not feel well. *See* Rosenfeld Affidavit, ¶ 3-5. He argues that "his diabetes, his tiredness after a lengthy, international journey, and the fact that he did not feel well at the start of the interrogation (confirmed by his clear confusion), further support

suppression." *Id.*

However, the evidence is to the contrary. At no point during the interrogation did Rosenfeld ever indicate that he did not feel well or demonstrate anything at all that would qualify as "clear confusion." The videotape does not lie; it shows that Rosenfeld was alert and responsive throughout the interview, showing no sign of illness or distress. Rosenfeld was given breaks to go to the bathroom, drink water, and eat. (Id.). Forty minutes into the interview, when Rosenfeld asked to go to the bathroom, he mentioned in passing, and for the first time, that he was diabetic:

R: I can go to the rest room?

JL: You need to go to the restroom?

R: Diabetic you know? [5:10:05]

JL: Okay.

Nothing in the video suggests that he was suffering any acute, negative effect from that condition. The agents subsequently asked him about his medical conditions and whether he needed to see a doctor. Rosenfeld told them that he did not need to see a doctor. (*See* Ex. A at 36-37). Nor did Rosenfeld indicate any desire to go to the hospital when told that was the procedure if he had any health concerns. (*See* Ex. A at 31-32).

I thus conclude that, at the outset of the interrogation, Rosenfeld waived his right to counsel, so the agents were free to question him in the absence of a lawyer.

The question is whether he retracted that waiver at any point. Rosenfeld argues that he asked for the presence of counsel four separate times during an interrogation that lasted just over an hour and twenty minutes (Ex. B. and C). He contends that the first three requests were

ignored.

*The First Mention of a Desire for Counsel*

The agents began by asking Rosenfeld about his involvement with certain entities for which PPP and/or EIDL loans had been submitted. Rosenfeld was reluctant to answer the agent's questions absent assurance that he would not be prosecuted if he told them what they wanted to know. It is quite clear from the videotape that Rosenfeld believed he could extricate himself from his predicament by negotiating with the FBI agents,[2] offering his cooperation in exchange for leniency. "I can cooperate with you everything but I want to know [what happens] if I cooperate with you and if I don't cooperate with you.," (Ex. A at 5; Ex. B at 6:35-7:05; *see also, e.g.*, Ex. A at 6-8 (extensive discussion regarding potential cooperation). At one point, Rosenfeld asked the agents a very straightforward question: "If I cooperate, do I still get prosecuted or not?" Special Agent Lewis responded in an equally straightforward manner, "That's not up to us. There's a prosecutor[.]" (Ex. A at 8; Ex. B at 10:37).

Once Rosenfeld appears to understand that his strategy was not going to work–that the agents were not going to make him any promises in exchange for his cooperation—he first mentions wanting a lawyer:

> R: Oh, I have to know before you cannot talk and talk and talk and then you have nothing, then I don't have to talk and that's it.
>
> JL: If you're willing to take a chance, you just said that
>
> R: You tell me a chance to talk, but if I talk, I got more problem, you understand?

[2] Rosenfeld told the agents that he had "talk[ed] to people before today in the FBI, I know people in the FBI" and had been talking to them as recently as "last year." (Ex. A at 4; Ex. B at 5:40; see also Ex. A at 7 (asking whether he can "deal with the people I deal with before at the FBI").

JM: You have what?

R: When you talk, you get more problem. Maybe it's better if I don't talk nothing, and … I take my chance. I don't know, tell me…

JM: And you take your…

R: No.

JM: We don't give advice. But what we're saying is, what we charged you with, is what we believe you are doing. If you are telling us, we have it wrong…

R: Yeah, but I didn't do, I didn't sign. That means that I can still…

JL: Okay. So, I think that when we're saying let's walk through it, that's what we're talking about. Because we have applications with your name, your name.

R: But that's not my signature.

JL: But it is, and I can show you your signature.

R: Show me…

JL: Okay.

R: If you can show me my signature.

JL: So if this is the opportunity you wanna take today to tell us who maybe you either believe . . .

R: **Okay I tell you everything, but I want a lawyer if I'm not going to be…**

JL… because right now…

R: **…if I give you all the details…**

JL: …everything's leading to you.

(Ex. A at 8; Ex. B at 11:41) (Emphasis added). The agent and the defendant were talking over one another during this exchange, with the agent saying, "So if this is the opportunity you wanna take today to tell us who maybe you either believe…because right now

everthing's leading to you;" and Rosenfeld more or less simultaneously saying, "Okay I tell you everything, but I want a lawyer if I'm not going to be...if I give you all the details."

The Government argues that when Rosenfeld said, "I want a lawyer if I'm not going to be...I give you all the details," he was saying that he might want an attorney in the future. I agree. Although he used the present tense, what Rosenfeld said, in essence, was this: "If I decide to cooperate [i.e., "if I give you all the details"], then I want a lawyer." The words Rosenfeld uttered did not unequivocally indicate to the agents that he had already made the decision to "give you all the details" – only that, if he should make such a decision, he would want to have a lawyer involved. That Rosenfeld had not yet made such a decision is implicit in his very next volunteered statement, which was a request that the agents get "the big, the head of the..." (presumably to make out a deal); it is also fairly inferred from the fact that he continued to respond to the agent's subsequent questions by trying to steer the discussion to the possibility of doing a deal, even though the agents had plainly told him that was not possible. *See* Ex., (Ex. A at 16; Ex. B at 23:57) (R: I told you, we can talk, I can help you, you can help me, and that's it.); (Ex. A at 18; Ex. B at 33:05)(R: Okay, but then don't let me to then cooperate and tell everything and then tell me... I'm ready to cooperate, I'm ready to do everything that you need, but let me talk to the prosecutor, let them come talk to me no problem; JM: That's not happening right now, right now.; (Ex. A at 19; Ex. B at 35:12)(R: Okay, but always we make a deal, I have to know what I got if I cooperated, what I didn't get if I cooperated. You know? There is to make a decision. You tell me if I you cooperated, it's like one two three, if you didn't cooperated, then four, five, six. I don't ask you to show me the cards because ...; JL: But you know that doesn't happen today.).

Therefore, this case is indeed analogous to *United States v. Scarpa*, 897 F.2d 63 (2d Cir. 1990), the defendant, asked if he had an attorney, said "he was going to get a lawyer." *Id.* at 66. Despite Scarpa's seemingly emphatic statement, the Second Circuit emphasized that the defendant "did not *request* counsel when he stated that he would get a lawyer." *Id.* at 70 (emphasis in original). So too here: nothing in Rosenfeld's statement about wanting a lawyer if he "give you all the details" constituted a request. It is also analogous to *Rushion v. Marshall*, No. 07-CV-2093 SLT, 2010 WL 3938407 (E.D.N.Y. Sept. 30, 2010), a case in which the petitioner asked if he could "speak to a lawyer later," and so was held not to have invoked "his right to counsel at the time of the interview." *Id.* at *1, *5.

Because Rosenfeld did not make an unequivocal request for counsel at this point, it is not necessary to address the Government's back-up argument— which is that, having arguably asked for a lawyer, Rosenfeld proceeded to engage the agents in further conversation about cooperation without waiting to be questioned.

*The Second Mention of an Attorney*

Rosenfeld next brought up an attorney at twenty-two minutes into the interview. Again, he does so in the context of telling the agents that he only wishes to cooperate with them if he gets "benefits" in return. When the agent once again explains that she is in no position to make him any promises, Rosenfeld says: "OK, then take a break and tell me what I can do, I may talk nothing, not now, *if you want me to take a lawyer to discuss, I can take a lawyer to discuss*, but I'm not going to fight with the government for ten years, for fifteen years, to, you know, I can put all the cards on the table, even more than you know even other companies…." (Ex. A at 15; Ex. B at 22:00) (Emphasis added).

What Rosenfeld does here is put the onus on the agents – if *they* want him to get a

lawyer he can get a lawyer and "put all the cards on the table." That is not an unqualified demand for a lawyer. In fact, it is even more contingent than the statement Rosenfeld made at 11 minutes. *See Davis*, 512 U.S. at 459; *see also U.S. v. Figaro*, 568 F.Supp.3d 459, 469 (S.D.N.Y. 2021) ("Where a defendant merely references a lawyer or inquires as to the potential need for one, the law does not require agents to stop their questioning.").

The questioning continued. It was still not illegal.

*The Third Mention of an Attorney*

Approximately forty minutes into the interview, Rosenfeld tells the agents: "I think the best thing is if I take a lawyer, I think it's going to be better because he has more experience that I, I see that obviously you want me to talk to talk to talk to talk, and I think it's better if I take a lawyer."

Despite Rosenfeld's use of the phrase "I think," his statement qualifies as an unambiguous invocation of his right to counsel. In *Wood v. Ercole*, 644 F.3d 83, 91 (2d Cir. 2011), the Second Circuit concluded that the defendant's statement, "I think I should get a lawyer" was not ambiguous or qualified, because there was no "maybe" or "perhaps" to render the request dubious. Rather, saying, "I think I should get a lawyer" – or, in Rosenfeld's case, "I think the best thing is if I take a lawyer…I think it's better if I take a lawyer" – is, per *Woods,* an unqualified request for counsel in order for questioning to proceed. Unlike the words spoken at twenty-two minutes, this is not in the nature of a question and does not put the onus of making the decision on the agents. And unlike the words spoken at eleven minutes, it is not qualified with any "if," is not contingent on some decision that may or may not be made in the future, and does not lack the requisite degree of clarity. This time, Rosenfeld's meaning is clear.

So unsurprisingly, the Government does not argue that Rosenfeld's initial statement at 40 minutes is in any way equivocal; it simply notes that the agent responded by saying, "OK." (Gov't Br. at 21). Rather, it argues that, having made this statement, "Rosenfeld spontaneously—and immediately—initiated further discussions," thereby rendering subsequent questioning lawful.

But the transcript of this portion of the interview gives the lie to the Government's position that Rosenfeld initiated any further discussions about the substance of the investigation. Here is the exchange, in its entirety:

> JL: You need to go to the restroom?
>
> R: Diabetic you know? [5:10:05]
>
> JL: Okay.
>
> [JL gets up.]
>
> R: I think the best thing is if I take a lawyer, I think it's going to be better because he has more experience that I, I see that obviously you want me to talk to talk to talk to talk, and I think it's better if I take a lawyer.
>
> JL: Okay.
>
> R: No, you think I'm right?
>
> JL: I don't give legal advice.
>
> R: No, you don't think that I'm right, because I see that you can tell me nothing, have to wait for a supervisor…
>
> JL: I think you know that, you know with cooperation, nothing is made today. And you know that once we leave here, the prosecutor's gonna call me, and she's gonna ask…
>
> R: Okay, but in the main frame, that I'm ready to cooperate, if they can offer me something today, let me see what they tell me.

JL: Okay

[agents depart; male agent enters. conversation about key, unlocking handcuffs, taking R. away to restroom]
[5:11:10]

[Male voice off camera and Rosenfeld making small talk]

R: Do you have someone who speaks Hebrew

Male Voice: Yeah, we have

R: I would prefer to speak to someone who speaks Hebrew, better understand

[UI]

[silence Rosenfeld alone]

[5:19 agents re-enter; small talk; JL phone rings, JL departs]

R: [5:19:40] I think I will… wait for the morning to the prosecutor . . . whatever he can offer me. [UI] Cause otherwise to talk, to talk I'm willing, I'm willing to …to give them information about [UI] loans…about unemployment… about uh …other things … I, I can dig and dig and dig and find because I'm very connected in the community…

JM: Ok

R: Ok?

[5:20:07 JL returns]

JM: He was, you want to just say it again for Jen, you said…

R: I say I can cooperate everything with you and everything…but I will wait in the morning and come to the prosecutor [UI] ..and if you have someone some people who can speak Hebrew even better and can talk more fluent…I can do everything but keep in mind, if its going to be out I don't care but if it's going to be out that I was arrested, then many people will not eh and um some are going to be afraid. Still I can do something but [UI]

JL: Yeah I'm mean listen, cooperation is in your best interest right now. You are facing jail time on these charges, like you say you didn't apply for the loan, but you know who, who applied for the loan?

R: I can't say but I have some idea

JL: I mean everything points to you right now and cooperation would be…

R: Okay I'm going to cooperate, I tell I tell some prosecutor for tomorrow that speaks Hebrew or a translator.

JM: We can use a translator in the future

[cross talk]

JM: I mean your English – but you seem to understand everything we've said so far

R: you know but uh, the little things one word can make the difference, here's the problem, it's not like ah…..

JM: But you've understood everything we've said to you?

R: I definitely understood most of the things, I understood the subject, you know…[UI] ..I don't understand every word but I know what you want

JL: *So you didn't apply for a PPE loan in Rose 123 Consulting*

*R: (shakes head) No. [UI]*

*JL: Did you apply for an economic disaster loan in Israel Gifts?*

Tr. at 21-23. *(Emphasis added at the point the agents began questioning again.).

A fair reading of this exchange is that Rosenfeld asked for a lawyer because the Government wanted him to "talk, talk, talk," and these agents could "tell me nothing" about a deal – which, since the moment the interview began, had been Rosenfeld's sole interest. When the agent told him that cooperation was in his interest, he did not begin to spill out information; instead he said, "Let's see what they offer me." When Rosenfeld returned from the bathroom, he did not engage the agent in anything that was even arguably substantive conversation about what they wanted to know. Instead, he continued in the previous vein – he

discussed getting a deal to cooperate. When he said, "I'm going to cooperate," he qualified that statement by indicating that he would do so the next day, in the presence of a prosecutor (the person who could offer him a deal) and a Hebrew translator. Rosenfeld did not retract his previous demand for a lawyer and he did not jump start a conversation about the merits of the investigation. The first mention of anything that related directly or indirectly to the substance of the investigation, as opposed to the possibility of Rosenfeld's getting a deal in exchange for cooperating, was the agent's question, "So you didn't apply for a PPE loan in Rose 123 Consulting?"

That question should never have been asked. Rosenfeld had asked for counsel and had indicated that he did not want to talk any more until the next day, and then only to a prosecutor. His comments and requests did not "open up a more generalized discussion relating directly or indirectly to the investigation." Therefore, they were not the sort of statements that eviscerated his invocation of counsel. The Supreme Court held, in *Bradshaw*, supra., 462 U.S. at 1045, that not every conversation initiated by a defendant indicates that he is once again waiving his now-asserted demand for counsel; rather, only statements that reflect such a waiver will undo the assertion of the right to counsel. Or, as the Court put it:

> But even if a conversation taking place after the accused has "expressed his desire to deal with the police only through counsel" is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation.

Bradshaw, 462 U.S. at 1044. In *Bradshaw*, the defendant's statement—"I do want an attorney before it goes very much further"—was held to be an unequivocal demand for counsel. Here,

too, Rosenfeld's statement is not at all equivocal in light of *Wood.* The Government's silence on the point concedes as much. And Rosenfeld's post-invocation conversation with the agents did not indicate any desire to waive his previously asserted right to have counsel present during questioning. Rather it indicated only a desire to talk cooperatively when he could talk with someone who could offer him a deal.

The interrogation should have stopped at that point.

But it did not. The agents' questioning continued for another 15 minutes, until Rosenfeld said, "Get me a lawyer and that's it." Tr. at 25. Only at that point did the agents end their substantive questioning.

Accordingly, Rosenfeld's motion to suppress his statements is granted to the extent that the Government is precluded from introducing any statement Rosenfeld made after he invoke his right to counsel at 40 minutes into the interview. *See* Ex. A at 21; Ex. B at 40:20.

Rosenfeld's Motion to Suppress Evidence Obtained from His Cellphone

Rosenfeld argues that the evidence recovered from his cellphone should be suppressed because the search warrant was not supported by probable cause.

*Legal Standard*

In order for there to be probable cause to search, there must be "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "Probable cause is a fluid concept turning on the assessment of probabilities in particular factual contexts, and as such is not readily, or even usefully, reduced to a neat set of legal rules." *United States v. Raymonda*, 780 F.3d 105, 113 (2d Cir. 2015).

A district court "must accord considerable deference to the probable cause determination of the issuing magistrate." *Walczyk v. Rio*, 496 F.3d 139, 157 (2d Cir. 2007).

Such deference derives in part from the "strong preference for searches conducted pursuant to a warrant," *Gates*, 462 U.S. at 232, 236. Thus, the task of a reviewing court is simply to ensure that the "totality of the circumstances" afforded the magistrate "a substantial basis" for making the requisite probable cause determination. *Id.* at 238 (quotation marks omitted).

Even when a warrant is issued without probable cause, the suppression of evidence seized is not automatic. "[B]ecause the remedy exacts a heavy toll on the justice system, the exclusionary rule will apply only to deter deliberate, reckless, or grossly negligent conduct by law enforcement." *United States v. Boles*, 914 F.3d 95, 103 (2d Cir. 2019). Accordingly, "[w]hen an officer genuinely believes that he has obtained a valid warrant . . . and executes that warrant in good faith, there is no conscious violation of the Fourth Amendment, 'and thus nothing to deter.'" *Id.* (quoting *Raymonda*, 780 F.3d at 118).

To claim the "good faith exception," an officer's reliance on a warrant must be objectively reasonable. The good faith exception therefore does not protect an officer who relies on a judicially authorized warrant "in at least four circumstances: (1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable." *Boles*, 914 F.3d at 103.

*The Search Warrant was Supported by Probable Cause*

The Affidavit submitted to the magistrate in support of law enforcement's request to search Rosenfeld's cellphone established a fair chance that the evidence sought would be found on the cellphone because (1) the phone number had been provided as the point of contact on several fraudulent loan applications and for a bank account that received fraudulent loan

proceeds as part of a scheme involving the submission of dozens of fraudulent loan applications through electronic devices, and (2) Rosenfeld had used the cellphone to communicate with a co-conspirator also charged in the Complaint.

Rosenfeld argues that the Complaint, which was incorporated into the Affidavit, makes no reference to his cellphone. (Mot. at 13). But that is irrelevant. It is undisputed that the Complaint set forth probable cause that Rosenfeld had participated in the charged offenses. Nor does Rosenfeld dispute that law enforcement had probable cause to seize the cellphone from his possession at the time he was arrested. And the Affidavit articulated the connection between the cellphone and the charged offenses.

Rosenfeld further argues that the Government failed to establish a sufficient nexus between his cellphone and the offenses because the Affidavit contained no detail about specific communications made using the phone in furtherance of the fraud scheme. (*See* Mot. at 15). However, establishing a sufficient nexus "does not require direct evidence and may be based on reasonable inference from the facts presented based on common sense and experience." *United States v. Singh*, 390 F.3d 168, 182 (2d Cir. 2004). The fact that Rosenfeld's phone number was included on multiple fraudulent loan applications and a bank account used to receive fraud proceeds provided strong circumstantial evidence that the cellphone would have been used to make or receive phone calls, text messages, or emails in connection with those loan applications or that bank account and that records of such communications would be present on his cellphone.

Even beyond that, the Government showed that Rosenfeld and his charged co-conspirator, Zigelman, communicated over Rosenfeld's cellphone during the time period—August 2022—for which the Government had records, permitting a reasonable inference that

they would have done so during the time frame of the charged fraud scheme as well. Thus, the allegations in the Affidavit were sufficient to establish probable cause. *See United States v. Estimo*, No. 19 Cr. 711 (NSR), 2020 WL 6075554, at *18 (S.D.N.Y. Oct. 14, 2020) (noting that "courts have found probable cause to support the search of a cellphone seized incident to an arrest even where the search warrant application did not introduce into evidence *any* specific communications sent from, or received by, the seized phone."); *see also United States v. Arias Cassila*, 2022 WL 2467781 (S.D.N.Y. July 6, 2022) (similar); *United States v. Sosa*, 379 F.Supp.3d 217, 221 (S.D.N.Y. 2019) (rejecting argument that warrant application failed to allege facts connecting relevant Instagram communications with a cellphone because it "ignores the practical realities of how users are likely to engage with [online] platforms . . . [and the] common sense that these communications . . . would be on a mobile phone in possession of defendant at the time of his arrest").

*Agents Acted in Good Faith*

Even if the Affidavit had not sufficiently established probable cause (which it did), suppression would still be unwarranted because law enforcement relied on the warrant in good faith. Assuming for purposes of argument only that the magistrate judge was incorrect in her probable cause determination, that independent determination was surely not contrary to established law or so facially deficient that reliance upon it was unreasonable.

Rosenfeld's motion to suppress evidence obtained from the search of his cellphone is denied.

This constitutes the decision and order of the Court

December 7, 2023

United States District Court Judge